**Federal Defenders**
OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and
Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

March 26, 2021

By ECF and Electronic Mail
The Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Sinmyah Amera Ceasar, 17-cr-48 / 19-cr-117 (KAM)

Dear Judge Matsumoto,

  We write in response to the Court's Order on the government's motion for reconsideration of the Court's grant of our request to hold Ms. Ceasar's VOSR sentencing in abeyance for six months. We provided the DEEP program with all of the information they requested, and will continue to do so; and, we have disclosed what we know about her violation of supervised release to the Court. We also address briefly Probation's objection memorandum.

  **I. DISCLOSURE TO THE DEEP PROGRAM**

  Defense counsel first sought to connect Ms. Ceasar with the DEEP program in July 2020, on the day she was released from prison, specifically because Judge Weinstein had directed that the parties seek to find a deradicalization or demobilization program for Ms. Ceasar at the time she was released from prison.[1] At that time, Richard Aborn, the Executive Director of DEEP, advised that DEEP was focused on "pre-entry work" rather than reentry. Subsequently, on March 1, 2021, Mr. Aborn reached out to defense counsel to let us know that DEEP was re-launching after having to shut down during the height of the pandemic, and was now open with greater capacity, including having added a re-entry program for offenders being released from prison and a specific focus on offenders with mental health issues:

---

[1] Defense counsel has also made repeated efforts to engage the U.S. Attorney's Office in assisting with Ms. Ceasar's rehabilitation (and, thus, deterrence), including offering that Ms. Ceasar could speak regularly with the FBI case agent with whom she worked closely when she was cooperating and asking if the U.S. Attorney's Office could assist with identifying deradicalization resources. We have been told by the line A.U.S.A.s that they do not believe this is appropriate—because they are appealing Ms. Ceasar's sentence to the Second Circuit. Supervisors in the U.S. Attorney's Office have indicated more readiness to jointly work to keep Ms. Ceasar from reoffending—which would seem to be indisputably in everyone's interests.

> "We have reformulated DEEP, partnering with the CASES Nathaniel Clinic - a well-known and highly regarded NYC based Mental Health clinic. This partnership not only permits us to continue serving the extremism population, but also permits us to take referrals whereby mental health issues are a major component driving an individual's behaviour, rather than true ideological commitment to a cause.
>
> ….
>
> DEEP takes a *precision* prevention approach – working one-on-one with low and medium risk individuals, who are court/law enforcement involved. DEEP tailors highly specialized interventions to their specific risks and needs."

E-Mail from Richard Aborn, dated March 1, 2021.

      Defense counsel was delighted to hear this, believing that–as every expert has concluded–Ms. Ceasar was exactly the type of individual DEEP is aimed at: someone whose mental health issues are a major component of her behavior.  It also seemed fortuitous that Ms. Ceasar had already voluntarily begun seeing a therapist at the Nathaniel Clinic (in addition to the Probation-contracted therapist she has a weekly zoom session with), with whom DEEP partners on mental health issues.  We immediately reached out to Probation, forwarding them the information about DEEP and expressing excitement at this possibility for Ms. Ceasar.  The line AUSAs were copied on our ensuing back-and-forth with Probation and never responded or communicated any concerns about her participation in DEEP to us or to Mr. Aborn.  We also spoke directly to the Acting U.S. Attorney to get his views on whether Ms. Ceasar would be an appropriate candidate for DEEP; he expressed that he thought she could be.

      We also immediately responded to Mr. Aborn, reminding him of our prior correspondence regarding Ms. Ceasar, and explaining that she was now on supervised release and needed "sustained one on one help with the issue of her reverting to corresponding with extremists when she is lonely and seeking relationships."  DEEP asked for the risk assessments that had been conducted at the time of sentencing and we immediately sent the government's risk assessment, conducted by Dr. Kostas Katsavdakis (who also works with DEEP), and the evaluation of the defense forensic psychologist, Dr. Katherine Porterfield.  Dr. Katsavdakis had concluded Ms. Ceasar was a moderate risk to re-offend.  We then had a lengthy video call with Mr. Aborn, one of his senior staff members, and the therapist at Nathanial Clinic whom DEEP works with, to discuss Ms. Ceasar.  We explained that Ms. Ceasar was doing well on supervision in some regards (including stable housing, employment, and studying for her GED), but had been struggling in other regards, including violating the terms of her supervision by downloading apps without permission and communicating with people with whom she was not allowed to communicate.  We explained our view that she needed real help in how to make good decisions and how to override her instinct, driven by her past acute traumas, to develop relationships with inappropriate and abusive men, as well as to hide her behaviors.  We also explained to Mr. Aborn that we did not believe the line AUSAs would support her joining DEEP at this time.  The DEEP therapist subsequently conducted a one-hour intake session with Ms. Ceasar.  We were

2

informed that the intake had gone well, and that DEEP was prepared to accept Ms. Ceasar. She immediately began twice weekly sessions with the therapist, and has been flourishing in that treatment, which is highly engaged and open, and does not have the specter of an immediate report of her statements in therapy to her Probation officer, like her Probation-contracted therapy sessions do.

We did not hide anything from DEEP. We answered every question they asked, and then some. We are happy to provide any information that would be useful to DEEP in the future and have already offered to have Ms. Ceasar undergo an additional risk assessment if that would be useful. We continue to believe that engagement with the DEEP program would be highly valuable to Ms. Ceasar, since it is aimed exactly at someone in her situation, unlike the conventional therapy and behavioral programs she has been in to date.

## II. DISCLOSURE TO THE COURT

The government insinuation that defense counsel provided the Court with a misleading picture of Ms. Ceasar's conduct is baseless and wrong. We have provided the information we were aware of based on our review of the discovery that was provided, our extensive discussions about Ms. Ceasar with Probation, and the VOSR report. As discussed in our March 23 letter, defense counsel diligently sought to review the hundreds of thousands of screenshots generated by the CIMP phone monitoring software, which captured Ms. Ceasar's phone use every ten seconds during the weeks after her release leading up to the instant violation. That phone data was offered to the Court as Exhibit E to our March 23 letter. *See* Def. Ltr. of March 23 at 4 n.3.

Based on our review, we conveyed to the Court what we gleaned from the CIMP data: that the vast majority of the time she spent on her phone during the period in question was spent on productive or innocuous activities including job applications, therapy, education, training, medical appointments, cooking, sewing, music, and socializing; that her downloading and use of applications on her mobile device without permission and her communications with unauthorized people was inexcusable; and that "[w]e expect[ed] the government to identify" other serious unauthorized communications including contact with an individual who had previously expressed extremist sentiments. *Id*. at 7. To the extent the government believes this is not a complete picture, and that there are relevant facts beyond the scope of what defense counsel is aware of, it falls on the government to provide those facts. As the government states in its March 25 letter, they intend to detail Ms. Ceasar's conduct in a forthcoming sentencing memorandum. Govt. Ltr. of March 25 at 4. Defense counsel is not in a position to make representations to the Court beyond what we have reviewed and seen evidence of. As far as we are aware, Ms. Ceasar has been in total compliance with the conditions of her release since the violations for which she has already accepted responsibility.

Additionally, we hoped the government and Probation would join us in advocating for the requested abeyance once they saw how valuable DEEP appears to be for Ms. Ceasar. We did not want to lock either the government or Probation into objecting, particularly given our ongoing discussions with senior supervisors at the U.S. Attorney's Office. We fully expected they would

3

write to the Court separately regarding their positions; we hoped that our letter and the exhibits would move them. Following the filing of our motion for an abeyance we reached out to both Probation and the government to discuss their positions further.

### III. PROBATION'S OBJECTION LETTER

Probation objects to holding the sentence in abeyance, asserting that Ms. Ceasar is not appropriate to participate in DEEP because (1) she has been reluctant to open up about her offense conduct in therapy sessions with a probation-contracted therapist, (2) is in a re-entry posture, and (3) has been found to be a moderate risk of recidivism. *See* March 25, 2021, Probation Memorandum.

As to the first ground, Ms. Ceasar has attended every probation-contracted therapy session, but has had difficulty building trust with the therapist, who is not specialized in trauma therapy nor in extremism. This came to a head on March 9, 2021, when the therapist, in a session, began to question Ms. Ceasar about the government's allegations regarding her conduct on supervision, and told her that her Probation Officer had told the therapist all about the allegations and the therapist needed to know what had happened. Ms. Ceasar understandably and appropriately invoked her right to counsel and ended the session, immediately informing her Probation Officer and counsel that she had found this interrogation on her offense conduct in the course of a therapy session to be frightening. Probation agreed to transfer her to a more experienced therapist within the same office, and she has commenced sessions with that person. By contrast, Ms. Ceasar has been far more open both with the therapist at Nathaniel Clinic that she sought out on her own, and who has trauma-training, and with the DEEP therapist with whom she has begun to do sessions. She has also opened up about these issues with counsel and with friends. As Amera recently said herself in messages to an old acquaintance, she turned to "the wrong bad Muslims." *See* Exhibit E to our March 23 letter, SD 298:1. Trust is critical to a therapeutic relationship.

As to the second ground, while, as described above, DEEP was originally framed as a "pre-entry program", it was recently re-launched, according to its director, Richard Aborn, to include a re-entry portion, because of its recognition of the lack of any demobilization programs for people returning home from prison.

Finally, the DEEP program materials state that they work with "low and medium risk individuals." Indeed, when DEEP was run by the U.S. Attorney's Office, defense counsel had a medium risk individual who did very well in the program. Accordingly, while Probation may think that DEEP is better for low risk individuals, DEEP was informed (and reviewed the government's expert's risk assessment so finding) that Ms. Ceasar was assessed as a moderate risk and accepted her. Counsel pointed this out to Probation several weeks ago, and, at Probation's request, sent Dr. Katsavdakis' risk assessment of her to Probation, which was conducted after her underlying offense conduct and after her violation of her pre-trial release.

4

Moreover, while Ms. Ceasar was assessed as moderate risk for extremist beliefs and further communications with extremist individuals, there is consensus among the experts that she poses a low risk of danger or violence. According to the government's own terrorism risk assessment expert, Dr. Katsavdakis, Ms. Ceasar presents a "moderate risk" for "extremist attitudes or acts." *See* Katsavdakis Report (enclosed as Exhibit A) at 15; *see also* June 24, 2019 Sent. Tr. at 111:23-113:11. But upon questioning by Judge Weinstein at sentencing, Dr. Katsavdakis testified that the likelihood of Ms. Ceasar becoming physically violent is "going to be low, because . . . she has absolutely no history of physical violence or aggression. June 24, 2019 Sent. Tr. 112:118-21. And Dr. Marc Sageman, a defense expert on counter-terrorism and former CIA Operations Officer, testified that "I was part of the National Threat Assessment Center. I know what a threat assessment is. There is no risk of violence. She is not violent." June 25, 2019 Sent. Tr. at 206:2-3. Judge Weinstein agreed, finding that Ms. Ceasar "presents or will present when this sentence has been served almost no danger to the country," June 26, 2019 Sent. Tr. at 361:8-10, and that in this case "deradicalization . . . would reduce the likelihood of reoffending. In this instance, rehabilitation and specific deterrence of Defendant seem to go hand in hand." Statement of Reasons, *United States v. Ceasar*, Dkt. No. 112 at 44.[2]

Probation provides no alternative suggestions for demobilization treatment for Ms. Ceasar. Jail certainly has not been found to deradicalize anyone. Going to the same probation-contracted therapist that everyone else on supervision goes to, with no trauma specialization, seems unlikely to succeed. And, Probation seems to have no plan for what will happen after the Court jails Ms. Ceasar for the year it requests, during which she will have no mental health treatment whatsoever and will lose her employment and housing, and then come back out into the community once again. Ms. Ceasar did not violate the terms of her supervision–or commit the underlying crimes–because she does not respect the law or needs to be punished. She committed these violations because she is deeply damaged, as every expert has found. Kicking the can down the road a year will worsen that damage, not ameliorate it.

Probation also entirely omits that Ms. Ceasar has had no compliance issues in the last five months, and in fact, has done quite well. We understand that Ms. Ceasar's is a difficult case. But throwing her in jail because of fear and difficulty finding appropriate resources is not the answer. She needs trauma-based and behavioral treatment in a context aimed at extremism: DEEP is the only program that provides that. It is worth a try.

Thank you for your consideration of this letter.

---

[2] Dr. Vidino, the government expert on deradicalization, echoed the need for structured disengagement programming for someone like Ms. Ceasar, but testified that while these programs exist in Europe he continues to advocate for them in the United States. *See* June 24, 2019 Sent. Tr. at 37-39. In DEEP, the Court now has an option for a therapeutic intervention that the experts agreed could be an effective approach.

                                                                   Respectfully Submitted,

                                                                   _/s/_

                                                               Deirdre D. von Dornum
                                                               Samuel I. Jacobson
                                                               Sean Larner
                                                               *Counsel to Amera Ceasar*

cc:    all counsel of record (via ECF)
        U.S. Probation (via Email)