

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DMP:ICR/JGH
F. #2016R00532

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 29, 2021

<u>**Filed Under Seal**</u>

<u>By ECF & Email</u>

The Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:    United States v. Sinmyah Amera Ceasar
>        Criminal Docket No. 17-48 (KAM)
>        <u>Criminal Docket No. 19-117 (KAM)</u>

Dear Judge Matsumoto:

The government respectfully submits this letter in advance of defendant Sinmyah Amera Ceasar's ("Ceasar" or "the defendant") sentencing for violations of her supervised release terms.  On January 5, 2021, Ceasar pleaded guilty to violating (1) the condition of release governing her use of electronic communications services and (2) the condition barring her from contacting convicted felons without the approval of the United States Probation Department ("Probation" or the "Probation Department").[1]

For the reasons set forth herein, and above all because of Ceasar's extensive, willful betrayal of the Court's trust and her repeated deception of the Probation Department, the Court should revoke Ceasar's supervised release and sentence her to 14 months' incarceration, the top of the advisory Guidelines range, to be followed by an additional ten years' supervised release.

Ceasar's pervasive violations of her probation conditions – which began almost immediately after her release from prison in July 2020 for two separate criminal convictions, including a terrorism offense – demonstrate, again, that she cannot be trusted to follow even

---

[1]     The violations are detailed in the Violation of Supervised Release Report ("VOSR Report") dated November 2, 2020.

the most basic rules imposed by this Court. Moreover, the conditions Ceasar continues to violate with impunity cannot be dismissed as mere "technical" violations or explained by a lack of resources or support; to the contrary, the Court imposed the conditions to protect the public from further dangerous criminal conduct by Ceasar, including her now repeated unmonitored contacts with supporters of violent extremist ideology. For the third time in three years, there is overwhelming evidence that not only has Ceasar chosen to flagrantly violate the law, but that she concealed her actions from Probation and the Court, making it impossible to determine the full scope of her malfeasance. And she did all of this – just has she has done before – while receiving counseling arranged by both the Probation Department and defense counsel.

In sum, the sentencing goals governing revocation of supervised release and Ceasar's breach of the Court's trust, including the need for specific and general deterrence, public safety, and promoting respect for the law, demand the imposition of an incarceratory term sufficient to ensure those goals are met and that Ceasar is deterred from further violations.

I.      Factual Background and Procedural History

Because the above-captioned matters were reassigned to this Court following Judge Weinstein's retirement after Ceasar's 2019 sentencing, the government summarizes below the underlying offense conduct and procedural history of the case, along with Ceasar's current conduct.[2]

---

[2]     The record includes Probation's Presentence Investigation Report as revised on April 13, 2019 (the "PSR"), the Government's Redacted Sentencing Memorandum, No. 17-CR-48, ECF No. 101, the Government's Exhibits to the Sentencing Memorandum, including Government's Exhibit 1, the Report of Dr. Lorenzo Vidino ("Vidino Report"), and the transcripts of the three-day sentencing hearing. Judge Weinstein's Statement of Reasons for the sentence is reported at United States v. Ceasar, 388 F. Supp. 3d 194 (E.D.N.Y. 2019). The government can provide additional copies of these and other materials on request, however many of the underlying exhibits and records, including the Vidino Report and transcripts of Ceasar's plea allocutions and the sentencing hearing are included in the Government's Appendix filed in connection with its sentencing appeal, and are available from the Second Circuit docket via PACER. See Gov't App'x Vols. I-II ("GA"), United States v. Ceasar, No. 19-2881-cr(L), ECF Nos. 32-33 (2d Cir.).

Additionally, the government has provided with this filing a limited, sealed appendix ("the Appendix" or "App.") containing many of the records cited herein, as well as a copy of the Gov't's unredacted, sealed sentencing memorandum previously submitted to Judge Weinstein and defense counsel (see App. at 1-39). The sealed Appendix will be provided to the Court and defense counsel via email.

A.    The Material Support Offense and Ceasar's Cooperation

Beginning as early as January 2016 and continuing until her arrest by the FBI in November 2016, Ceasar used numerous social media accounts to praise, promote and support the designated foreign terrorist organization the Islamic State of Iraq and al-Sham ("ISIS")[3] and its brutal acts of violence, including praising a terrorist attack conducted by an ISIS supporter in New York City.  She helped to disseminate ISIS propaganda, developed contacts with ISIS members overseas, and used her contacts with ISIS facilitators in an effort to help at least five people join ISIS abroad.  She also intended to travel to ISIS-controlled territory to join ISIS with a man she met online.

On November 15, 2016, Ceasar was arrested at John F. Kennedy International Airport and charged by criminal complaint with attempting and conspiring to provide material support and resources to a foreign terrorist organization, to wit, ISIS, in violation of 18 U.S.C. § 2339B(a).  When she was arrested, Ceasar was about to fly to Sweden, where she planned to marry ████████,[4] a Swedish national and fellow ISIS supporter.  Ceasar then planned to travel with ████ to ISIS-controlled territory.  In September 2019, ████ was arrested in the Philippines and charged, along with others, for his role in at least one ISIS-related bombing there.  ████ faces charges in the Philippines for Multiple Frustrated Murder and Multiple Attempted Murder counts.  His case is pending.

Beginning on November 18, 2016, Ceasar was detained at the Metropolitan Detention Center in Brooklyn, New York ("MDC").  On February 13, 2017, pursuant to a cooperation agreement with the government, Ceasar pleaded guilty to one count of conspiracy to provide material support to a foreign terrorist organization (the "Material Support Offense").  See United States v. Ceasar, No. 17-CR-48.  During her detailed allocution, Ceasar admitted to conspiring to provide material support to ISIS throughout 2016 and also that she herself planned to travel abroad and join ISIS, admitting that she "intended to make [Hijrah] to Dawla to join the group," using Arabic words frequently invoked by ISIS supporters to describe her plan to migrate to ISIS controlled territory.  See Feb. 2017 Plea Tr. at 27:3-7.  Ceasar's use of numerous different types of social media and encrypted messaging applications – including multiple pseudonymous Facebook accounts – to find and communicate with other ISIS supporters was central to her commission of the Material Support Offense.

Pursuant to her cooperation agreement, Ceasar was debriefed extensively by the FBI ████████████████████████████████████████████████████████████

---

[3]    The government also refers to ISIS herein as ISIL, which is the acronym for the Islamic State of Iraq and the Levant and is another name for the same terrorist organization.

[4]    Given the sensitive information contained in this letter, including the names of several of Ceasar's associates, as well as details of her prior cooperation, this letter has been filed under seal on the Electronic Court Filing System ("ECF").  The government will file a redacted version of the letter on ECF in short order.

██████████████████████████████████████

Ceasar ultimately breached her cooperation agreement.

## B.    The Obstruction Offense

In April 2018, based on the claim that her health was deteriorating at the MDC, Ceasar was released on bail subject to stringent conditions of release designed to prevent her from contacting members of terrorist organizations and their supporters, to limit her access to electronic devices and the Internet, and to permit Pretrial Services and the FBI to monitor her communications while on release.

During the bail hearing prior to her release, Magistrate Judge Levy asked Ceasar how she could be trusted to follow the proposed bail conditions and inquired, "How can you give everyone in the room some comfort that you will not be using any electronic devices at this point," to which Ceasar replied:

> For me, I know myself that I won't make trouble to make me come back or violate anything. I will occupy myself so I won't be bored or anything like that and I will obey the rules that I have to do until I am, you know, free or but I'm a person that I'm going to -- for me, what I say is true. I'm an honest person and I am going to do the best that I can and I will prevail. So I hope that y'all can trust me, and if y'all don't trust me as I show y'all – I will show y'all that I will be honest in what I do.

April 27, 2017 Hr'g Tr. 36-37.

Within two months, Ceasar had violated her cooperation agreement and her conditions of release.  As Judge Weinstein later found at sentencing, while on presentence release Ceasar committed "widespread violations of her release conditions" and

> [i]n addition to performing online searches for known ISIL affiliates and news of the organization's activities, [] [Ceasar] created at least three pseudonymous social media accounts and used them to contact or attempt to contact at least seven people she had previously identified to the FBI as supporting ISIL or other extremist groups. []  She also contacted or attempted to contact other individuals about whom she had not previously provided information to the government, but who had expressed support for ISIL or were associated with ISIL supporters.

United States v. Ceasar, 388 F. Supp. 3d at 203 (citations omitted).

The government's extensive investigation of Ceasar's activities during the brief period in which she had been released on bail uncovered, and Judge Weinstein found at

sentencing, that Ceasar had "deleted at least 1,000 Facebook messages and at least 1,000 text messages, as well as emails, audio files, and images," and that she "used Facebook to tell at least eight people that she intended to delete her Facebook accounts and provided many of these people alternative means of contacting her" the day before she was to meet with her Pretrial Services Officer. Id. at 204. In a further effort to conceal her conduct, Ceasar "instructed others with whom she was communicating via Facebook to delete their Facebook messages with her." Id.

While the full extent of Ceasar's activities on presentence release are not known because she deleted so many of her communications, the government's review of the communications that Ceasar was unable to delete revealed, and Judge Weinstein found, that "Ceasar's messages with ISIL supporters from this time period indicate that she believed that her conduct leading to conviction for conspiring to provide material support to ISIL was not wrong." Id. Among those communications were statements in which Ceasar attributed her arrest to the actions of "spies" and rejected responsibility for her criminal conduct by asserting that "'I didn't do anything wrong under Islam but stand up for my deen and got arrested for what I believe in . . . .'" Id. (citation omitted). As Dr. Lorenzo Vidino explained in his report, "'Deen' is an Arabic term for religion which has been interpreted narrowly by jihadists, 'to refer explicitly to their in-group, and [they] often use *deen* to express following and adhering to 'the right path' represented by their group's interpretation of Islam.'" Id. (quoting Vidino Report at 23 (italics in original)).

Notably, Ceasar's violation of her presentence release conditions came while she was receiving counseling from Dr. Katherine Porterfield, which was arranged by the Federal Defenders.

Following the revocation of Ceasar's bail in June 2018 and her return to custody pending sentencing, the government interviewed Ceasar in the presence of her attorneys in January 2019 about her conduct while on presentence release between April and June 2018. Ceasar lied repeatedly to the government during this interview. She lied about seeking out and consuming ISIS propaganda, lied about downloading an application to her phone to obtain ISIS news, lied about creating a pseudonymous email account and Facebook account, and lied about communicating with ISIS members and supporters. See Ceasar, 388 F. Supp. 3d at 204-05. Ceasar also "lied about her use of the name 'Umm Nutella,' the *nom de guerre* she used to identify herself among ISIL supporters throughout 2016," adamantly denying that she had used that name "because it would mean she was 'back supporting ISIS,'" notwithstanding the fact that records obtained by the government indicated "that she at least twice identified herself with this pseudonym in messages while on presentence release." Id. (citations omitted).

On March 7, 2019, as a result of her actions while on bail pending sentencing, Ceasar pleaded guilty to one count of obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(1) (the "Obstruction Offense"). See United States v. Ceasar, No. 19-CR-117. As part of her allocution, Ceasar also admitted that she lied to the government in the January 2019 interview, and that she had committed the Obstruction Offense while released on bail, triggering an additional mandatory consecutive punishment, under 18 U.S.C.

§ 3147(1). Because Ceasar committed multiple material breaches of her cooperation agreement while on presentence release, the government was released from its obligations under the cooperation agreement.

      C.      <u>Ceasar's Efforts to Circumvent Communications Monitoring While Incarcerated Pending Sentencing</u>

      After Ceasar's bail was revoked in June 2018, Ceasar violated Bureau of Prisons ("BOP") policy regarding email communications while awaiting sentencing by Judge Weinstein, an offense for which she was sanctioned. Specifically, while in custody in February 2019, Ceasar violated the BOP's email monitoring system by sending multiple emails to a South Africa-based individual whose email account (the "SA Account") was blocked by the BOP. <u>See</u> App. at 40-45. The BOP blocked the SA Account based on the BOP's conclusion that content associated with the SA Account "may potentially affect the safety, security and orderly running of BOP institutions."

      Ceasar knew the SA Account had been blocked by the BOP when she emailed it. <u>See</u> App. at 40. The BOP investigation into the matter revealed that Ceasar also used a third-party application to send messages to the SA Account, in an apparent attempt to evade the BOP's block on the SA Account. Additionally, in at least one of the emails she sent to the SA Account in February 2019, Ceasar again framed her upcoming sentencing before Judge Weinstein as a form of oppression and referred to the United States justice system using the same extremist derogatory term she often used when conspiring to provide material support to ISIS, writing:

> I am asking if you got my email I sent in January 2019? Please ask all muslimin to make duaa' for my release and success in freedom from this oppression may Allah give me hikmah and win this case against these kuffar![5] Allahumma amin.[6]

<u>Id.</u> at 41.

---

[5]      The word "kuffar" or "kufr" is a pejorative term frequently used by the defendant to attack others. The term is commonly translated as meaning infidel, rejecter or disbeliever and refers to people "who do not believe in Allah and reject Muhammad's prophecy." <u>See</u> Vidino Rpt. at 25. Ceasar used the term frequently during her commission of the Material Support Offense and the Obstruction Offense to refer to those who did not share ISIS's violent extremist ideology.

[6]      All passages quoted herein contain the spelling and punctuation as reflected in the source material.

Ceasar received a response from the SA Account stating, *inter alia*, "It is our fervent due that Allah Ta'ala sets you free from the prison. May Allah Ta'ala save you from the zulm and oppression of the kuffar. Make dua and thikr." See App. at 45.

Ultimately, in May 2019, one month before her sentencing, Ceasar admitted to contacting the barred SA Account. However, as part of her admission to the BOP, Ceasar falsely claimed to the BOP that she had received permission to contact the SA Account from the United States Attorney's Office. See App. at 40. No such permission was ever sought from or granted by this Office.

In March and April 2019, Ceasar again violated BOP's communication policy, this time by using a fellow inmate's email account to send multiple emails, including to her defense counsel. See App. at 47-49. The other inmate was convicted of conspiracy to violate the laws of the United States by conspiring to provide material support to ISIS. Notably, Ceasar also instructed this same inmate how to send texts and emails from pseudonymous accounts while in custody, again in violation of BOP policy. See App. at 46.

D.    Ceasar's Sentencing and the Government's Appeal

1.    The Sentencing Hearing

From June 24 to 26, 2019, Judge Weinstein conducted a three-day consolidated sentencing hearing for both the Material Support Offense and the Obstruction Offense that included expert testimony from two expert witnesses called by the government, and three expert witnesses called by the defense.

Dr. Vidino, a researcher who studies jihadist groups and the process of disengagement from those groups and deradicalization, submitted an expert report and testified for the government to provide background regarding ISIS and other jihadist groups to assist the Court in assessing the significance of Ceasar's Material Support Offense, and to understand the jihadist language and concepts that Ceasar used in her communications during the commission of the Material Support Offense and the Obstruction Offense, as well as upon her return to custody. Dr. Vidino opined that "Ceasar's frequent explanation that she was prosecuted because of her religion, which is also present in Ceasar's messages while on presentence release, indicates that she retains the mindset of an ISIL supporter." Ceasar, 388 F. Supp. 3d at 208. Dr. Vidino also testified that there are no disengagement and deradicalization programs in the United States that could assist a radicalized adherent of jihadist ideology to disengage from ISIS and to deradicalize. See id. at 207.

Dr. Kostas Katsavdakis, a clinical and forensic psychologist, testified regarding the results of a threat assessment he had performed based on meetings with the defendant and his review of relevant records. See id. at 208-12. Dr. Katsavdakis opined "that Ceasar poses a moderate risk for violent/extremist beliefs, further radicalization, and possible acts." Id. at 212.

Defense expert Dr. Marc Sageman, a former CIA officer and forensic psychiatrist, opined that Ceasar's support of ISIS was an "emotional affiliation" instead of an ideological commitment to its cause, and that, because ISIS no longer held territory, there was no risk that Ceasar would re-offend or commit an act of violence. See id. at 213-14.

Defense expert Dr. Katherine Porterfield, a psychiatrist who met relatively frequently with Ceasar following her arrest in November 2016 through the date of sentencing, opined that Ceasar was drawn to ISIS as a result of Ceasar's experience with past trauma, and that her "behavior while on presentence release was typical of the behavior survivors of trauma exhibit during recovery." See id. at 214-15. Dr. Porterfield opined that "relapse" and "mistake" is a common feature of the "wavy line" trajectory of recovery from past trauma. See id. Dr. Porterfield attributed Ceasar's commission of the Obstruction Offense and her reengagement with ISIS supporters while on presentence release to Ceasar having been "released without enough planning and without enough support," and she further opined that Ceasar "could not handle the stress at that point of being out, not having enough treatment, and not having enough of a community." Id. at 215-16 (quoting Dr. Porterfield, Sent. Tr. 248:1-249:4). Dr. Porterfield acknowledged during her testimony that she had been meeting with Ceasar during the period in which Ceasar committed the Obstruction Offense and that Ceasar had deceived her by not disclosing her reengagement with ISIS supporters. Sent. Tr. 268:20-25. Despite this, Dr. Porterfield opined that Ceasar does not have a continuing commitment to ISIS, and that further imprisonment would cause Ceasar harm because she suffers from Post-Traumatic Stress Disorder and requires trauma-focused treatment that Dr. Porterfield claimed Ceasar could not receive in prison. See Ceasar, 388 F. Supp. 3d at 216-17.

Defense witness Ms. Daisy Khan, a self-taught expert in counter-extremism and women in Islam, opined, based on six meetings with Ceasar (see Sent. Tr. 162:2-5), "that Ceasar is no longer committed to ISIL and that she is regretful of her conduct," Ceasar, 388 F. Supp. 3d at 213, and "that Ceasar's attraction to ISIL was personal, not ideological. Ceasar was motivated, Khan [said], by the social isolation and trauma in her life, as well as her desire for purpose in life," id. at 212 (citations omitted).

> Khan went on to testify that [Ceasar] would benefit from access to a supportive and understanding community, as well as from continued psychiatric treatment. She suggested piloting a rehabilitation program in which [Ceasar] would be placed in a residential program, provided financial assistance, and given intensive mentoring and support in a Muslim community.

Id. 213 (citations omitted). But Ms. Khan, Judge Weinstein acknowledged, "ha[d] never designed or used such a program" id., and during her testimony Ms. Khan admitted that she has "no official training in this area at all," and no "facility to take [Ceasar] in." Sent. Tr. 178:1-3, 20-22. Instead, Ms. Khan volunteered to "mentor" Ceasar, a job that, as Ms. Khan described it, would involve "spiritual counseling" (Sent. Tr. 179:16-19), and "would require [them] spending time together . . . at least maybe once a week." Sent. Tr. 185:8-13. Ms. Khan

explained that she "would create a life plan for [Ceasar] as to what she needs to do with her life to reset her life in a different direction." Id.

At the conclusion of the hearing, Ceasar addressed the Court directly (Sent. Tr. 339-344). Regarding her past violations of the Court's trust, she stated:

> A year ago out on bail, I trusted my own judgment. The difference is now that I understand that I have terrible judgment and I can't trust what I think are good decisions. I now know the difference, which is that I know to seek proper help and advice only from the people like Dr. Porterfield, my attorneys and their team, and Daisy Khan.

Sent. Tr. 341.

Ceasar then addressed her future compliance, telling Judge Weinstein:

> I swear today to assure all of you I will comply to the rules and to get my priorities fulfilled. Even more so, I will build my life around positive people. To heal and to grow is freedom. I know now how to stop living unpredictably. I learned a lot from the journey of incarceration at times of being depressed and despair.

Id. at 343.

### 2. Judge Weinstein's Sentencing Determination

Following the testimony of the government and defense witnesses, and Ceasar's address to the Court, Judge Weinstein concluded that Ceasar "ha[d] moved substantially towards rejection of ISIL and now abjures the terrorist ideology." Sent. Tr. 350:14-16. In both his oral statement of reasons and in his more extensive published opinion, Judge Weinstein emphasized the traumatic circumstances of Ceasar's life that, in the views of Ceasar's experts, caused Ceasar to seek "ISIL as a way to deal with her harsh circumstances and because of clinical issues affecting her judgment." Ceasar, 388 F. Supp. 3d at 220; Sent Tr. 350:17-22.

Judge Weinstein emphasized his concern "that a lengthy term of incarceration during which her medical needs are not fully met would be extremely harmful to Ceasar's development as a productive member of society," and that "[c]ontinued separation of Ceasar from a supportive, non-incarcerated community will also be detrimental to the goal of rehabilitation." Ceasar, 388 F. Supp. 3d at 222. Thus, Judge Weinstein described his "ideal sentence" of placing Ceasar "in a deradicalization or disengagement program with provision for intensive educational, emotional, and economic support to address her childhood trauma and its attendant results," even as he acknowledged that "no such satisfactory general program exists in the United States." Id. at 220.

Judge Weinstein found also that "[w]ithout access to treatment while incarcerated or on supervised release, [Ceasar] will likely remain an unrehabilitated supporter of ISIL and a continuing danger to the United States." Id. at 196. Judge Weinstein placed his hope for Ceasar's rehabilitation on "a program of intensive treatment and support for the term of her supervision after her incarceration" that "Ceasar's counsel and the Probation Department are developing," which Judge Weinstein indicated "should begin in prison and connect seamlessly with control and assistance by Probation." Id.

Thus, although Ceasar's undisputed Sentencing Guidelines (the "Guidelines") range was 360 to 600 months' imprisonment (Sent. Tr. 348:22-349:6), Judge Weinstein imposed a total sentence of 48 months' imprisonment, apportioned as follows: 46 months for the Material Support Offense, one month for the Obstruction Offense and one month pursuant to 18 U.S.C. § 3147 because Ceasar committed the second offense while on bail, to be followed by a total of eight years' supervised release subject to conditions similar to those Ceasar had violated on presentence release. Sent. Tr. 349:23, 355:19-360:11.

On December 13, 2019, the government filed its principal appeal brief, arguing that Ceasar's sentence—87 percent below the low-end of the applicable Guidelines range—was substantively unreasonable. See Appellant's Br., United States v. Ceasar, No. 19-2881(L), ECF No. 31 (2d Cir. Dec. 13, 2019). The Second Circuit heard oral argument on the case in October 2020 and its decision is pending.

E.    Ceasar's Conduct While Incarcerated

In the year following Judge Weinstein's conclusion at her June 2019 sentencing that Ceasar "ha[d] moved substantially towards rejection of ISIL and now abjures the terrorist ideology" (Sent. Tr. 350:14-16), she continued her pattern of circumventing restrictions on her communications in prison and continued to use jihadist language and concepts in her communications with others.

1.    Ceasar's Continued Circumvention of BOP Regulations While Incarcerated

On May 6, 2020, just months before her release from prison, Ceasar was again caught violating BOP policy, this time regarding inmate phone calls. Specifically, Ceasar participated in a prohibited three-way phone call by dialing a person on her approved list of contacts and then connecting to a third associate in a different jail who was not on Ceasar's approved contact list. Ceasar subsequently admitted to the violation and lost 27 days of good time credit, delaying her release from prison. The government's subsequent review of Ceasar's jail calls from 2019 and 2020 showed she engaged in similar three-way phone calls in violation of BOP regulations on several other occasions.

Toward the end of her prison sentence, Ceasar made multiple statements evincing her intention to evade the Court-ordered monitoring of her electronic communications while on supervised release. For example, during a May 23, 2020 recorded prison call with an associate, Ceasar discussed buying a cell phone during her planned bus ride from Tallahassee

to New York and explained that she needed an internet-capable phone so she could download WhatsApp and other free applications.[7]  As context, in 2016, as part of her commission of the Material Support Offense, Ceasar used WhatsApp to communicate with an associate whom, after her November 2016 arrest, Ceasar identified to the government as an ISIS supporter with bombmaking skills who spoke at length to Ceasar his/her desire to conduct a violent attack. Ceasar's downloading and use of WhatsApp prior to her return to New York would have, by definition, constituted unmonitored electronic communications in violation of her conditions of release.

During a June 22, 2020 recorded prison call, Ceasar told another associate "I'm gonna get a phone and stuff we can chat the whole way," referring to her bus ride from Florida to New York.  On July 22, 2020, days before her release, Ceasar again told an associate during a recorded prison call that she intended to buy and begin using an internet-enabled cell phone immediately upon release from prison – and thus before Probation could begin monitoring the device as required by her conditions of supervised release.  Specifically, Ceasar detailed her plans to buy a new phone with WiFi service at a rest stop on her bus ride from Florida to New York City immediately after her release from FCI Tallahassee.

2.  <u>Ceasar's Continued Affinity for Violent Extremist Ideology and Association with Supporters of Violent Extremist Beliefs While Incarcerated</u>

After her sentencing in June 2019, Ceasar continued evincing support for ISIS and its violent ideology and continued associating with others who espouse violent extremist beliefs, despite her claim at sentencing that she had disavowed such beliefs.

For example, in April 2020, an inmate ("Inmate-1") incarcerated with Ceasar at FCI Tallahassee filed a complaint report in which Inmate-1 accused Ceasar of bumping her. In the same report, as well as in a subsequent interview with the FBI, Inmate-1 reported hearing Ceasar openly express her support for ISIS.  Inmate-1 reported that on one occasion, Inmate-1 and Ceasar discussed why Ceasar was incarcerated, during which Ceasar stated that she was "here for ISIS, I praise ISIS" and that the "FBI caught me."  Inmate-1 further reported that Ceasar also told Inmate-1, "I root for ISIS, you root for the USA."  Inmate-1 further reported that Inmate-1 did not witness Ceasar attempt to recruit anyone to join her feeling about ISIS, but that Ceasar was openly supportive of the terrorist group and frequently spoke about it.

Similarly, in recorded prison phone calls in April and May 2020, Ceasar was recorded referring to others as "kuffar" which, as discussed above and in the government's prior filings, is a term she used frequently during her commission of the Material Support Offense and the Obstruction Offense to refer to those who did not share ISIS's violent extremist ideology.

---

[7]    WhatsApp is an online communication platform that advertises, among other things, fully encrypted text messaging.

Ceasar's continued association with others who espouse hateful, violent beliefs while incarcerated is also reflected in a recorded prison call she had with █████████ ("█████") on October 29, 2019. During the call, Ceasar claimed, in reference to women in prison with her, that "they all lesbian here." In response, ██████ repeatedly assailed gays as "not Muslim" and told Ceasar to stay away from them and that "you're supposed to take them to the highest mountain and throw 'em off," to which Ceasar responded, "Yeah." At one point, Ceasar stated that she tells lesbians in prison "I'm against that, I respect you as a human being, I'm against it myself." ██████ again told Ceasar to "stay away from them people," to which Ceasar responded, "The mind's corrupted though." Shortly thereafter, Ceasar stated, "I'll fight somebody, 'get off me, don't touch me'," at which point ██████ agreed that she should not let a lesbian touch her and added, "Yeah, you supposed to, you supposed to defend yourself, don't let nobody do that to you…shit, try to kill them if you can," at which point Ceasar laughed.

As context, hateful comments about, and the promotion of violence against, gay people was a common feature of Ceasar's support for ISIS prior to her arrest in November 2016. In June 2016, Ceasar used a Facebook account – one of the same ones she repeatedly used to recruit for ISIS – to praise Omar Mateen's ISIS-inspired shooting rampage that killed approximately 49 people at Pulse, a gay nightclub in Orlando, Florida. Within days of the terrorist attack, Ceasar celebrated the mass murder and linked it to her own extremist beliefs and association with ISIS, posting that "I seen 2 gay men on train and thought of Florida shooting and I wanted to blow them up…Baqiyya," in reference to the Arabic ISIS slogan "baqiyya wa tatamaddad" which translates in English to "remaining and expanding." In another Facebook post around the same time, Ceasar again praised the Pulse attack, this time saying that ISIS "did their thing." See App. at 30-31.

## II.    Ceasar's Conduct on Supervised Release

Ceasar was released from FCI Tallahassee on July 28, 2020. She returned to New York City by bus the next day and began violating her conditions of supervised release almost immediately. As a result, in addition to Probation's Court-directed monitoring of her conduct, the FBI and the United States Attorney's Office commenced an investigation into Ceasar's post-release activities. As part of the investigation, the government sought and obtained numerous business records related to Ceasar's online activities. Additionally, on October 16, 2020, the FBI seized Ceasar's cellular phone pursuant to a search warrant issued in the Southern District of New York. The FBI has also reviewed more than 110,000 screenshots taken of Ceasar's cellular phone and stored as part of Probation's court-ordered electronic monitoring of Ceasar's cellular phone. [8]

As detailed below, the investigation has revealed that, in addition to the supervised release violations to which Ceasar pleaded guilty, since her release in July 2020

---

[8]    The phone monitoring software installed by Probation on Ceasar's cellular phone as part of her conditions of supervised release recorded screenshots of the phone at ten-second intervals while the phone was being used.

Ceasar has (1) re-contacted at least one individual she previously identified as a supporter of Islamic extremism and then attempted to cover-up that contact; (2) received money from a foreign-based individual who has admitted to supporting ISIS, and sought to conceal her communications with this individual; (3) without Probation's knowledge or approval, installed and used numerous social media and electronic communications applications in addition to those cited in the VOSR Report; (4) deleted and attempted to conceal from Probation and the Court significant amounts of electronic evidence; (5) used Islamic extremist terminology; and (6) deceived, lied, and omitted material information when communicating with her Probation officer.[9]

### 1. Ceasar's Recontacting a Known Islamic Extremist

The government's investigation revealed that almost immediately after her release from FCI Tallahassee, Ceasar violated the special condition of supervised release barring her from associating "in person, through mail, electronic mail, the Internet, social media, telephone, or any other means with any individual known by her to be affiliated with any terrorism-related groups, organized crime groups, gangs or any other criminal enterprise."

As context, as a result of the COVID-19 pandemic, upon arriving in New York on July 29, 2020, Ceasar underwent a mandatory fourteen-day quarantine at a hotel in Queens, New York. Ceasar did not have access to a cellular phone during this period. However, an analysis of the hotel's phone records indicates that Ceasar used a landline to make approximately 148 outgoing calls for a total of approximately 24 hours of talk time.[10]

Phone records show that on August 9, 2020, a landline belonging to the hotel twice called the phone number of Ceasar's associate whom Ceasar previously identified to the FBI as a Taliban supporter located in the United States who had expressed a desire to travel to jihadist-controlled territory (hereinafter "Facebook User 2").[11] Ceasar's first call with Facebook User 2 on August 9, 2020 lasted approximately eleven minutes and the second lasted under two minutes. Ceasar did not report either call to Probation.

By way of background, while on bail pending sentencing in June 2018, and despite her release conditions explicitly barring her from contacting anyone with extremist

---

[9]     The government's investigation of Ceasar's post-release conduct is ongoing. To date, the evidence indicates that Ceasar has likely committed multiple new felony offenses, including intentionally making materially false statements to her Probation officer in violation of 18 U.S.C. § 1001, and obstructing justice in violation of 18 U.S.C. § 1512(c) by deleting electronic evidence to conceal the information from the Probation Department and the Court.

[10]    Records indicate that approximately 20 of the calls were made to defense counsel or their staff.

[11]    The individual is identified as "Facebook User 2" in the government's June 17, 2019 sentencing submission to Judge Weinstein. See App. at 17.

beliefs, Ceasar used one of her pseudonymous Facebook Accounts to contact and communicate with Facebook User 2. In her 2018 messages to Facebook User 2, Ceasar revealed her cooperation with law enforcement after her 2017 arrest. As detailed at Ceasar's sentencing, Ceasar also attempted to cover up her contacts with Facebook User 2 in 2018 by deleting their Facebook exchanges. The government ultimately recovered some of Ceasar's and Facebook User 2's exchanges only after executing a search warrant on an account controlled by Facebook User 2. Ceasar's deletion of contacts with Facebook User 2 was part of the factual basis for Obstruction Offense.

After completing quarantine on August 12, 2020, Ceasar moved into Hope House in the Bronx, where she has been residing since. This is the same location where Ceasar resided on presentence release in 2018 when she committed the litany of violations that triggered her bail revocation. That same day, Ceasar obtained an internet-enabled smart cellular phone provided by her defense counsel. Ceasar promptly informed her Probation officer and Probation installed the requisite monitoring software on the phone on August 13, 2020. Probation again instructed Ceasar, consistent with her conditions of release, that she must notify Probation of her creation of any social media account and provide the login information for each such account. Ceasar again acknowledged her understanding of these conditions.

Records show that on August 13, 2020, the day after she received her cellular phone, Ceasar inputted Facebook User 2's phone number into the phone's contacts under the pseudonymous name "███████." To the government's knowledge, ███████ is not a name Ceasar previously used for Facebook User 2, nor is the name a known social media moniker for Facebook User 2. Rather, Ceasar appears to have chosen the name to conceal her communications with Facebook User 2 from Probation, the government and the Court. After creating the contact, Ceasar used her phone to text Facebook User 2 stating, in sum and substance, "My phone number." See App. at 50.

Between August 13 and August 19, 2020, Ceasar and Facebook User 2 exchanged approximately 40 text messages. During these exchanges, Facebook User 2 asked Ceasar to "clarify what happened with you on how you were released from prison and put back in and now out again??" and stated that "Its just a confusing situation and as you know my husband is familiar with the federal system. It's a sunnah to bring clarity to your situation as not to leave anything to suspicion." Facebook User 2 also asked Ceasar about her specific counts of conviction and asked, "Were you charged with 18 U.S.C 2339A or 2339B?" Records show that, shortly thereafter, Ceasar and Facebook User 2 engaged in an approximately 17-minute phone call, the content of which is unknown to the government.

Ceasar never informed Probation of any of her contacts with Facebook User 2. Additionally, as discussed in greater detail below, the government's investigation revealed that Ceasar subsequently deleted from her cellular phone her text communications with Facebook User 2 as well as Facebook User 2's number from her phone contacts, all in an apparent attempt to conceal the communications.

    2. <u>Ceasar's Unreported and Unauthorized Use of Social Media Applications and Other Electronic Communication Service Accounts</u>

Charge One in the VOSR Report to which Ceasar pleaded guilty charged her with violating the special condition of release requiring her:

> to report to the Probation Department any and all electronic communications service accounts (as defined in 18 U.S.C. 2510(15)) used for communications, dissemination and/or storage of digital media files (i.e. audio, video, images). This includes, but is not limited to, email accounts, social media accounts, and cloud storage accounts.

VOSR Report at 8.

The VOSR Report lists 20 applications Ceasar downloaded to her cellular phone between August 13 and October 16, 2020 (the day the FBI seized her phone), all of which she failed to disclose to Probation in violation of her release conditions. <u>See</u> VOSR Report at 11-12. The government's investigation, including a review of records from Probation's phone monitoring software and a review of Ceasar's cellular phone pursuant to the search warrant, revealed that in addition to the applications identified in the VOSR Report, Ceasar in fact installed and registered numerous other electronic service communications accounts without informing Probation of the accounts or providing her login credentials, as required.[12] In several instances, Ceasar downloaded and used such applications shortly before communicating with her Probation officer and yet still failed to disclose them, while selectively disclosing certain other accounts.

    i. <u>Ceasar's Unapproved and Undisclosed Registration of a Facebook Account</u>

On August 12, 2020, Ceasar, using her full name, registered the Gmail address "███████████@gmail.com" (the "sinmyahameraceasar Gmail Account") and provided the email address to Probation, consistent with her conditions of release. Facebook records show that the next day, August 13, 2020, Ceasar used her sinmyahameraceasar Gmail Account to register a new Facebook account with the display name Amera Ceasar (the "Amera

---

[12]     The assertion in defense counsel's March 23, 2021 letter to the Court that the Google Hangouts application came preinstalled on Ceasar's cellular phone and was "never used by Ms. Ceasar" is not supported by the records. In fact, screenshots from Ceasar's phone indicate that she searched for and installed the Hangouts application on September 18, 2020. <u>See</u> App. at 51-54. Phone records further show that Ceasar logged into the Hangouts application on multiple occasions and invited others to use the application. Ceasar disclosed none of this to Probation.

Ceasar FB Account"). See App. at 55-61. On or about September 15, 2020, Facebook disabled the Amera Ceasar FB Account because the account violated Facebook's terms of service.[13] At no point prior to Facebook disabling the account on September 15, 2020 did Ceasar inform her Probation officer – as she was required to do – that she had created the Amera Ceasar FB Account.

Ceasar did not just fail to disclose the Facebook account to Probation; she lied to and misled her Probation officer about it. Specifically, records show that on August 13, 2020, Ceasar registered a TikTok account.[14] See App. at 62. Approximately one hour later, Ceasar registered the Amera Ceasar FB Account. Later that same day, Ceasar disclosed to her Probation officer the creation of the TikTok account but omitted any mention of the Facebook account she had already registered and, when asked about other social media applications, explicitly denied to her Probation officer that she had created any social media accounts other than the TikTok account.

On August 16, 2020, days after she had already registered the Amera Ceasar FB Account, Ceasar wrote to her Probation officer and asked about the possibility of creating a Facebook account, writing "I am trying to figure out can I make a FB page just for my music…" and explaining that she would be using the page to further her music career. See App. at 63-65. Ceasar's Probation officer responded:

> You are allowed to have social media as long as you advise as to what you have and continue to provide the username and password as you have been doing. I caution you to have FB if you don't feel comfortable with it as I wouldn't want you in a position that may put you in a bad space...

Id. at 63.

Later that evening, Ceasar wrote back to her Probation officer informing him, inter alia, that "the music producer keep telling me I need to have it," referring to Facebook, "But I'm like I have bad flashbacks" and that "I made my mind up I don't want it FB right now I just will music recording send it to emails." See App. at 65. By this time Ceasar had already created the Amera Ceasar FB Account without informing her Probation officer and, as indicated above, denied having such an account on August 13, 2020.

---

[13]    The government is not aware what specific term(s) of service Ceasar violated. The FBI discovered the existence of the Amera Ceasar FB Account on August 20, 2020, at which point a records preservation request was transmitted to Facebook. Accordingly, the government is unaware of the extent of Ceasar's use of the Amera Ceasar FB Account between August 13 and Facebook's receipt of the preservation request on August 20, 2020.

[14]    TikTok is a video-sharing social networking service used to make and share a variety of short-form videos.

ii.     Ceasar's Unapproved Use of Other Electronic Communication
        Applications

On August 31, 2020, Ceasar downloaded and installed on her cellular phone the application "TextNow" and created a new phone number for use on the application.[15]  Records from Ceasar's phone show that she deleted the TextNow application later the same day, after using it to make one phone call.  Ceasar never informed Probation of her download or use of the TextNow application.

Ceasar also downloaded to her cellular phone the encrypted communication platforms Signal and Viber, as well as Athan, the phone-based app associated with the social media site "IslamicFinder."[16]  Records, including screenshots from Probation's phone monitoring software installed on Ceasar's cellular phone, show that Ceasar downloaded and used each of these applications on her cellular phone without Probation's knowledge or approval.

For example, Ceasar downloaded the Athan application to her cellular phone on August 17, 2020.  Records show that Ceasar then logged into the Athan application more than 150 times in August and September 2020.  After registering the account, Ceasar posted messages on the site soliciting money and seeking a "Muslim sister" to socialize with in New York City.  In one post, Ceasar used the derogatory term "kufaar" to refer to non-Muslims which, as noted above, she repeatedly used while committing her Material Support Offense in 2016 – writing:

> That's one thing about Muslim community they want to judge
> people past and not help them out but most people went through
> a lot of trauma... And they want to know why people go to kufaar
> and get help better than the Muslim community it's shame and

---

[15]     TextNow is an application for phones, tablets and desktops that allows users to obtain a "free phone number" to call and text for free using WiFi.  See https://www.textnow.com/how-it-works (last visited March 16, 2021 at 10:30 p.m.).

[16]     The website at www.islamicfinder.org, which is self-titled "IslamicFinder: Info about Islam and Muslim Mosques (Masjids), Calendars, & Prayer times," is a directory of Islamic information on the Internet.  The site's stated mission "is to help Muslims around the globe navigate their daily lives; we offer innovative products and services that are truly world-class and delight our users."  The site, available in Arabic and English, also provides a search engine for finding a local Islamic center, mosque, and/or organization and prayer times near a city or zip code within the U.S. or in another country.  Information from IslamicFinder is provided by way of links or articles from other websites and separated into topics. The website also offers social media forums separated into five categories for U.S.-based users: "Ask a Muslim"; "Dua Requests"; "Halal Foods"; "New York" and "Muslims in USA."  IslamicFinder also offers a cellular phone application version of their website called "Athan."

prophet Mohammed saws said that was going to happen #AllahistheQadi[17]

See App. at 67.

Records from Ceasar's cellular phone show that beginning in September 2020, Ceasar used Athan to communicate with an individual ("Person-1") who resides in a foreign country ("Country-1"). By way of background, during a May 2016 interview with law enforcement personnel, Person-1 stated, in sum and substance, that he came to Country-1 in 1995 as a refugee after fighting in the Bosnian Army, and that he spent time as a prisoner of war after being captured by Croatian forces. Person-1 described himself as a good Muslim and stated that he supports ISIS as the current group in power, stating "ISIS are the group to follow and should be followed by all good Muslims." Although Person-1 stated that he is grateful for what Country-1 has provided him and does not want to get physically involved, he also stated that ISIS are able to justify their attacks overseas and if God orders the attacks then they are justified. Person-1 further stated he has health issues and alluded to mental health issues, possibly PTSD, resulting from his war experience.

On September 6, 2020 Ceasar "liked" a post by Person-1 on the Athan application. See App. at 68. Person-1's public-facing user profile on Athan is "Mumin" and his profile photo is the black flag of ISIS, as seen here:



As context, Person-1's post "liked" by Ceasar read: "2.42-And do not mix the truth with falsehood or conceal the truth while you know [it]… next is very sad; https://sites.google.com/site/jonelya/traitors The state of the Ummah today: https://tawheedulema.wordpress.com/". Ceasar then wrote a comment soliciting donations for food and included her phone number and email address. See id.

Person-1's Athan profile with the ISIS flag was visible to Ceasar each time she interacted with Person-1 on the application. Additionally, by the time she "liked" his post on September 6, 2020, Ceasar had already viewed one post in which Person-1, under the profile name Mumin with the ISIS flag, provided a link to a website describing "Arab rulers who

---

[17] All spelling as reflected in original message.

helped take over Jerusalem" as traitors, and another in which Person-1 wrote "the real truth about hijra"[18] and linked to a YouTube site which is no longer available to view on YouTube. See App. at 69-70.

After their initial interaction on Athan on September 6, 2020, Ceasar and Person-1 exchanged emails in which Person-1 offered to help Ceasar. On September 7, 2020, Person-1 invited Ceasar to use Signal, the encrypted messaging application. Ceasar then installed the Signal application on her cellular phone and created an account which she never disclosed to Probation. Ceasar then used Signal to provide her banking information to Person-1. See App. at 71-89.

On the evening of September 7, 2020, Ceasar and Person-1 exchanged multiple messages confirming Person-1's transfer of approximately $500 to Ceasar via Western Union, including sending her the tracking information for the transfer. See App. at 90-94. Approximately one minute later, at approximately 10:02 p.m., Ceasar texted her Probation officer and falsely told him that "Hey my family sent me western union money tomorrow can i pick it up please." Id. at 95. Ceasar's Probation officer did not respond that night. The next morning, September 8, 2020, Ceasar again texted her Probation Officer, this time falsely claiming, "My friend mom sent me money" and seeking permission to travel to a Western Union branch to collect funds actually sent by Person-1.

Based on the investigation to date, including Ceasar's own description of Person-1 to others, Person-1 is neither a family member nor a family friend. Rather, he is a stranger she met online through the Athan application.

Later on September 8, 2020, after twice lying to her Probation officer about the source of the funds, Ceasar collected the money from Western Union. At no point during their exchanges on September 7 and 8 did Ceasar inform her Probation officer about her installation of Signal, her encrypted contacts with Person-1, that Person-1 was a stranger to her, or that Person-1 was the one who had just wired her approximately $500.

---

[18]     As with many Arabic terms coopted by Islamic extremists, hijra has both a benign and derogatory use. As Dr. Vidino explained in advance of Ceasar's sentencing, "[f]or jihadists, hijrah is a term used predominantly for supporters/followers in countries outside the operational zones of the jihadist group to travel to those zones and join the group. To make hijrah is to travel from a 'land of disbelief' [] to a territory where a jihadist group has created or seeks to create what it deems a perfect Islamic society." Vidino Rpt. at 23. In 2016, Ceasar repeatedly used the term in this extremist manner as part of her support for ISIS and admitted to doing so in her plea allocation to the Material Support Offense. See Feb. 2017 Plea Tr. at 26-27.

That evening, Ceasar viewed a post on Athan by Person-1 stating, "Christians is our enemy[]" in response to another user's post. See App. at 98. Ceasar then replied to Person-1's message stating "watch what you say." Id. at 99. Within minutes, Ceasar received a Signal message from Person-1 asking, "Is anything wrong when I'm saying Christians is our enemy". Ceasar replied with the following series of Signal texts to Person-1:

"Please don't say that in my phone";

"They are people of the book";

"We are all same we sin";

"We are bad in different ways"; and

"Allah is the judge of that"

Id. at 100.

Screenshots of Ceasar's cellular phone show that immediately after sending the above-listed Signal messages to Person-1, Ceasar changed the settings within the Signal application so that all incoming and outgoing messages within her conversation thread with Person-1 would automatically be deleted from the application within five seconds of being viewed.[19] See App. at 101-110. Then, at approximately 9:30 p.m. on September 8, 2020, Ceasar appears to have started the process of uninstalling the Signal application from her phone. Id. at 111.

The next morning, September 9, 2020, Ceasar emailed Person-1. See App. at 112. That same night, at approximately 11:38 p.m., Ceasar re-installed the Signal application on her cellular phone. Id. at 113-120. Ceasar then used Signal to call Person-1 over the encrypted platform; the call was not answered. Id. at 121. Ceasar then used Signal to send several text messages to Person-1, writing "Hello" and "R u there," to which Person-1 responded "yes." The two then exchanged messages in which Ceasar told Person-1 she was going to delete the Signal application from her phone because of data limits, after which Person-1 informed Ceasar that he uses only Signal because it is encrypted. Ceasar told Person-1 she would keep in touch via email and that her "Auntie" thanked him. See id. at 122-124. Records, as well as the search of Ceasar's phone pursuant to the search warrant indicate that Ceasar again uninstalled the Signal application from her phone.

Notably, records show that on September 8, 9, and 10, 2020, Ceasar exchanged texts with her Probation Officer about her upcoming schedule and her health; at no time during

---

[19]     As indicated in the screenshot from Ceasar's cellular phone, Signal provides users the option to set automatic deletion for five or ten seconds after a message is viewed, as well as an option for no automatic deletion.

any of these interactions, nor at any other point, did Ceasar inform her Probation officer about her use and ultimate deletion of Signal from her cellular phone.

Additionally, phone records show that Ceasar communicated with her mentor Daisy Khan multiple times shortly before, during and after the period when Ceasar was communicating with Person-1, including communications exchanged with Ms. Khan each day from September 1 through September 10. See App. at 125-37. Ceasar's engagement with Daisy Khan during the same time period did not dissuade her from any of her unauthorized communications with Person-1.

Probation has informed the government that, at some point after Ceasar's receipt of $500 sent by Person-1 in September 2020, Probation learned that Ceasar was soliciting money from strangers online. When Probation discussed the matter with Ceasar, Ceasar informed explained that she was seeking money from members of the Muslim community and that giving money to those less fortunate is a normal thing to do within the faith. Ceasar's Probation officer cautioned her that she should not take money from strangers she met online, and that she should only take money from people she knew. Ceasar's Probation officer also instructed Ceasar that she should provide him with the identity of anyone who provided her with money in the future, along with the sender's basic background information. Probation explained that this instruction was for Ceasar's protection, so that she did not inadvertently take money from someone from whom she should not receive money. Ceasar stated that she understood the direction and agreed to follow it.

Ceasar then continued her attempts to communicate with Person-1 over an encrypted platform that she never disclosed to Probation. On September 27, 2020, Ceasar downloaded and installed the Viber encrypted messaging and voice call application at approximately 9:12 p.m. The application then auto-populated all contacts previously saved in Ceasar's cellular phone, including Person-1's contact. A few minutes after downloading Viber, Ceasar used the application to call Person-1. The call was not answered. See App. at 138-43.

On the morning of September 28, 2020, Ceasar exchanged text messages with her Probation officer in which she informed him that she had deleted the Zynn social media account from her cellular phone because of technical difficulties with the application, and stated "so you can delete that out of the file please." See App. at 146. She then added that she would register an Instagram account instead of the Zynn account. Ceasar then created an Instagram account. At no point in this text exchange did Ceasar inform her Probation officer that the night before, just hours before she deleted her Zynn application, she had installed Viber as described above. By contrast, Ceasar downloaded and registered an Instagram account on September 28, 2020, which she promptly disclosed to Probation as required. Again, Ceasar chose to disclose certain applications to Probation while hiding others. Records indicate that on September 30, 2020, Ceasar deleted or uninstalled the Viber application from her cellular phone. See App. at 144-45.

Records show that on October 5, 2020, Person-1, under his "Mumin" profile with the ISIS flag image, posted a statement on Athan condemning as "Kafir" an individual who wrote a message criticizing ISIS.[20]  See App. 147-48.

In October 2020, records show that despite Probation's explicit directive to the contrary, Ceasar again sought to obtain money from Person-1, this time going further to conceal her actions from Probation.  Specifically, on October 7, 2020, Ceasar began texting an associate ("Person-2") seeking to use Person-2 as a conduit to obtain more money from Person-1 without Probation's knowledge.  Ceasar told Person-2, "I'm trying to get money from this old muslim guy who helps me with bills and food but my probation officer said that I should know what Job he works and how he gets money general."  Ceasar continued, "Like I have to tell them everything," and "I said I get help from my friends time to time" and, in apparent reference to her Probation Officer, "He said that prosecutor like to fish for things and flip it in court to make things worse."  See App. at 150-53.  In a statement to the government, Ceasar's Probation officer denied the latter statement to Ceasar but confirmed, as detailed above, that he had instructed Ceasar not to accept money from strangers and to inform Probation about plans to accept donations from people she met online.

Ceasar also told Person-2 that she wanted the money from Person-1 for a job-related class and certification, and that "I have to tell my lawyers and probation officer everything about how my friend is getting money."  Ceasar then described Person-1 as "from Australia" and "[h]e converts."  Ceasar further described Person-1 as "a random from afar" and explained that she needed Person-2's assistance in obtaining money from Person-1 without Probation's knowledge "because my probation and lawyers only trust my friends."  See App. at 155.  Person-2 wrote to Ceasar, "Y dont u type the email and fix it up and I'll send it dummy" and "ur lawyers and officers dont need to know about this" and "all they need to know is that I sent u they money."  Id.  Ceasar responded "Ok" and then wrote the equivalent of "hahahaha" in Arabic.  Id. at 156-59.  Ceasar then sent Person-2 a message Ceasar drafted for Person-2 to send to Person-1 requesting additional money for Ceasar.  See id. at 160.  To date, it is not known whether Person-2 succeeded in obtaining additional funds from Person-1 on Ceasar's behalf.

Records further show that on October 7, 2020, while still exchanging texts with Person-2 about obtaining money from Person-1, Ceasar engaged in a WhatsApp voice call with Daisy Khan, her mentor who testified at Ceasar's sentencing that she "would create a life plan for [Ceasar] as to what she needs to do with her life to reset her life in a different direction."  Sent. Tr. 185.  At approximately 3:35 p.m., while Ceasar and Khan were still talking, Person-2 texted Ceasar, in reference to Person-1, "What does he know u by?" and "And do I need to tell him how much we need?"  Then, while still talking with Khan, Ceasar wrote to Person-2, "1000" / "Amera Ceasar" / "From NYC" / "From Muslim Prayer app" /

---

[20]  The screenshots of Ceasar's phone obtained from Probation's phone monitoring software do not indicate whether Ceasar saw this specific post by Person-1.  Rather, the FBI viewed the post as part of its investigation.

"Put it". <u>See</u> App. at 162-79. In other words, while engaging in a scheme to avoid Probation's detection of her receiving money from an online stranger with extremist views and an ISIS flag as his profile photo, Ceasar was simultaneously talking to the individual defense counsel identifies as critical to Ceasar's successful rehabilitation. Phone records show that Ceasar also was in contact with her Probation officer and her defense counsel around the time she was soliciting Person-2's help in deceiving Probation. <u>See</u> <u>id.</u> at 154. None of these contacts deterred Ceasar from plotting to deceive Probation.

Additionally, records show that on January 5, 2021, the same day she pleaded guilty before this Court, Ceasar registered a WordPress account online, which she has not disclosed to Probation. WordPress is a web publishing site that allows users to create websites and blogs. WordPress also has a feature that allows users to send messages to each other.

Finally, records show that on or about February 13, 2021 – more than a month after she pleaded guilty to using multiple applications without Probation's knowledge or approval – Ceasar registered a Pinterest account. <u>See</u> App. at 180. Pinterest is an image sharing and social media service that enables users to, *inter alia*, save and share information, including by allowing users to send direct messages to each other. Ceasar never disclosed to her Probation officer her creation of her Pinterest account. Records show that Ceasar's most recent login to her undisclosed Pinterest account occurred on or about March 9, 2021 using the Hope House WiFi network. It is unknown what internet-capable device(s) Ceasar has used to log into this account.

### 3. Ceasar's Continued Use of Extremist Language

After her release from prison in July 2020, Ceasar again reverted to using some of the same extremist terminology for non-Muslims that she used when committing her Material Support Offense.

For example, as noted above, after registering her Athan account in August 2020, Ceasar wrote a post in which she referred to non-Muslims as kuffar. <u>See</u> App. 67. On August 24, 2020, Ceasar texted an associate about clothing and stated, "She can have it because I don't wear there kuffar clothes." On September 1, 2020, in text to another associate, Ceasar wrote "I said they want me to look like a kafir immodest clothes." On September 6, 2020, in response to a user's question on the Athan application about the permissibility of eating Kentucky Fried Chicken, Ceasar wrote "it's not halaal, it processed and killed by kafir," using an alternative spelling for "kuffar." <u>See</u> App. at 181. On September 20, 2020, while texting an associate, Ceasar stated that Algeria was part of Morocco "until kuffar and devil split the muslims up to settle in our land." <u>Id.</u> at 182.

Ceasar's persistent, almost casual use of such language is disturbing. She used the same kind of extremist language for non-believers during the commission during her Material Support Offense and while violating her bail conditions in 2018, further undermining her claim to Judge Weinstein that she had changed. Moreover, Ceasar's use of such language on social media sites – including on sites she failed to identify to Probation as directed – poses

precisely the danger that her bail conditions are aimed at preventing: her drawing the attention of, and ultimately communicating with, other extremists online.

### 4. Ceasar's Deletion of Electronic Information

Prior to the FBI's October 16, 2020 seizure of her cellular phone, Ceasar – just as she did while on presentence release in 2018 – deleted records to conceal her unlawful conduct.

For example, Ceasar deleted her August 16, 2020 text messages with Facebook User 2. Specifically, records from Ceasar's cellular phone indicate that at approximately 7:27 a.m. on August 18, Ceasar scrolled through her text messages with Facebook User 2, during which her text exchanges with another associate are also visible. Approximately one minute later, Ceasar again scrolled through her text messages but this time her texts with Facebook User 2 were no longer visible, indicating that she had deleted them. Later that same morning, Ceasar met with her Probation officer for a previously scheduled office visit, suggesting that Ceasar deliberately deleted her text messages with Facebook User 2 so that her Probation officer would not see them. See App. at 183-190. An analysis of Ceasar's cellular phone following its seizure by the FBI confirmed that Ceasar deleted all of her text messages with Facebook User 2. Screenshots of Ceasar's cellular phone show that Ceasar also deleted Facebook User 2's contact information from her cellular phone at some point between August 20 and 22, 2020. Id. at 191-93.

Ceasar also deleted or uninstalled her encrypted Signal and Viber accounts, both of which she used to contact Person-1 and neither of which she disclosed to Probation. Additionally, as detailed above, prior to uninstalling Signal from her phone, Ceasar, immediately after a series of exchanges with Person-1, changed the settings within the Signal application to automatically delete messages in her conversation thread with Person-1 five seconds after each message was viewed. Ceasar also deleted or uninstalled the Athan application from her cellular phone after using the application numerous times, including to contact Person-1.

### 5. Ceasar's Unapproved and Unreported Contacts with Convicted Felons

Charge Three of the VOSR Report to which Ceasar pleaded guilty charged her with contacting two previously convicted felons, ███████████ and ███████████. See VOSR Report at 9, 12. ██████ is a relative of Ceasar's currently serving a life sentence for murder. Id. at 12. Ceasar and ██████ served time together at FCI Tallahassee, where ██████ was serving a sentenced of 210 months' incarceration for drug trafficking and money laundering offenses. In addition to the information provided in the VOSR Report regarding Ceasar's unapproved, unreported communications with ██████, records show that ██████ identified Ceasar's contact information to the BOP as belonging to "███████████" on ██████'s approved contact list, presumably so that ██████'s and Ceasar's communications would evade potential blocking by the BOP communication monitoring system.

24

The government's investigation has revealed that in addition to these unapproved contacts, Ceasar also repeatedly contacted at least five other convicted felons between August and October 16, 2020, when her internet-capable cellular phone was seized by the FBI. Ceasar engaged in these contacts without Probation's knowledge or permission and thus in violation of her conditions of release. Each is discussed in turn.

Records show that Ceasar began contacting ███████████ ("███████"), her former husband by Islamic marriage and a convicted felon, from her quarantine hotel landline phone beginning in July 2020. Phone records show that once she received her cellular phone on August 12, 2020, Ceasar engaged in numerous phone calls and texts with ████, as well as several WhatsApp text exchanges. ████ was previously convicted of, *inter alia*, a felony drug trafficking offense. Notably, on or about August 31, 2020, Ceasar used ████'s name, email address and credit card to purchase access to the Gappsy application[21] and install it on her cellular phone. Ceasar did this while on a WhatsApp voice call with ████. Ceasar disclosed none of these facts to Probation.

Additionally, as summarized below, Ceasar also contacted the following convicted felons, all without Probation's knowledge or approval:

- ███████, previously convicted of heroin distribution and credit card fraud. Between August 2020 and March 2021, Ceasar has exchanged numerous calls and texts as well as WhatsApp, TikTok and Instagram messages with ████. As of this writing, their last contact consisted of three phone calls on March 23, 2021, totaling approximately an hour.

- ██████████ who, as discussed above, made hateful remarks about gay people to Ceasar on a recorded jail call in 2018. Ceasar and ████ communicated by phone and text multiple times between August 2020 and March 2021.

- ████████████, most recently convicted for possessing a firearm as a convicted felon. Ceasar and ████ have communicated numerous times since July 2020, including multiple texts exchanged since November 21, 2020 and an approximately eight-minute phone call on March 23, 2021.

- ██████████████, previously convicted of money laundering and a former FCI Tallahassee inmate with Ceasar.

In many instances, Ceasar was in communication with her Probation officer in close proximity to many of her unapproved felon contacts and nevertheless did not disclose them.

---

[21]     Gappsy is a mobile application-building software tool.

IV.     The Appropriate Sentence

   A.     The Applicable Law

   At sentencing for a violation of supervised release, the court may "revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release," up to the applicable maximum term of incarceration.  United States v. Pringle, No. 19-CR-37 (PKC), 2019 WL 6682244, at *1 (E.D.N.Y. Dec. 6, 2019) (quoting 18 U.S.C. § 3583(e)(3)).  Prior to imposing sentence, the court must "consider the factors listed in 18 U.S.C. §§ 3553(a)(1), (a)(2)(B), (a)(2)(C), a)(2)(D), (a)(4), (a)(5), (a)(6), and, (a)(7), including the nature and circumstances of the offense, the history and characteristics of the defendant, the applicable sentencing range, and the need for the sentence imposed."  United States v. Diggins, 547 F. App'x. 57, 59 (2d Cir. 2013); see also 18 U.S.C. §§ 3553(a); 3583(e)(3).  Courts are also "directed to consider the non-binding policy statements found in Chapter Seven" of the Guidelines.  United States v. Lajara, 613 F. App'x. 64, 66 (2d Cir. 2015).

   In the VOSR context, the sentencing court "is not responsible for punishing the defendant's misconduct; rather, its focus is on the 'defendant's breach of trust' in violating the conditions of supervised release."  United States v. Kinsey, 661 F. App'x. 76, 78 (2d Cir. 2016) (quoting U.S.S.G. Ch. 7, Pt. A (3)(b)).  However, the sentencing court need not consider the defendant's violation of supervised release in a vacuum; to the contrary, while "at revocation the court should sanction primarily the defendant's breach of trust," the court may  take "into account, *to a limited degree,* the seriousness of the underlying violation and the criminal history of the violator."  United States v. Sindima, 488 F.3d 81, 86 (2d Cir. 2007) (quoting U.S.S.G. Chap. 7, Pt. A.U.S.S.G. Chap. 7, Pt. A.3(b) (emphasis in original).  Furthermore, "[l]eniency on previous sentences may justify an upward departure for violating supervised release."  United States v. Haskins, 713 F. App'x. 23, 26 (2d Cir. 2017) (citing United States v. Verkhoglyad, 516 F.3d 122, 129 (2d Cir. 2008)

   Ultimately, a district court faced with a violation of supervised release "has broad discretion to revoke its previous sentence and  impose  a  term  of  imprisonment," United States v. Wirth, 250 F.3d 165, 169 (2d Cir. 2001) (per curiam); see generally United States v. Brooks, 889 F.3d 95, 100 (2d Cir. 2018) ("District judges are given considerable discretion in fashioning the proper sentence for criminal defendants . . . [which] extends to sentences imposed for violations of supervised release.").

   B.     The Statutory Maximum Sentence & Applicable Guidelines Range

   Ceasar faces a statutory maximum penalty of two years' imprisonment for Charges One and Three to which she pleaded guilty.  See 18 U.S.C. § 3583(e)(3); VOSR Report at 15.  The applicable Guidelines range for the violations – both classified by U.S.S.G. 7B1.1(a)(3) as grade "C" violations – is 8 to 14 months' imprisonment. See U.S.S.G. 7B1.4(a).

Pursuant to 18 U.S.C. § 3583(h), the Court may also impose a maximum of lifetime supervision to follow any incarceratory sentence imposed.

      C.      <u>The Court Should Sentence Ceasar to 14 Months' Imprisonment</u>

The applicable sentencing factors demand a significant sentence here. An incarceratory sentence at the top of the Guidelines range is necessary, above all, to punish and deter Ceasar's extraordinary, pervasive breaches of the Court's trust and to protect the community from her further criminal activity. Ceasar has demonstrated utter contempt for this Court's orders. The time has come to hold her accountable. The government thus urges the Court to impose a sentence of 14 months' incarceration and to proceed with sentencing as scheduled on April 12, 2021.

Ceasar stands before this Court for sentencing just nine months after her release from prison for two serious felony offenses. She has, again, violated the Court's trust by, again, engaging in an egregious pattern of violating Court-imposed conditions and willfully deceiving those charged with trying to help rehabilitate her. After four years of repeated leniency, Ceasar has proven there is no restriction on her communications and use of electronic media she will not violate, and no act of deception she will not commit to conceal her actions and avoid accountability for them. Indeed, as detailed above, the government's investigation into Ceasar's post-release conduct has already uncovered her commission of new felony offenses. That investigation is ongoing.

The record is clear; Ceasar cannot be trusted on supervised release at this time. Permitting her flagrant manipulations and deceptions to go unanswered would serve only to undermine the importance of abiding by supervised release conditions and invite further breaches of the Court's trust. Ceasar has chosen this path. She has done so while receiving significant resources provided to her, including mental health counseling, support from her attorneys and their social worker, and contact with Daisy Khan, the individual who volunteered to mentor Ceasar. Despite all these resources, and after repeated opportunities to change her behavior, Ceasar instead chose to flagrantly abuse the trust placed in her.

The nature and circumstances of Ceasar's history and characteristics, underlying criminal offenses and her conduct on supervised release all are detailed above and in the lengthy record before this Court. A few points bear particular emphasis, however.

Ceasar's Material Support Offense was extraordinarily serious. For nearly a year, Ceasar sought to provide material support to ISIS when it was the most lethal terrorist organization in the world. She admitted that she did so after watching ISIS beheading videos, a fact that belies her later claim to Judge Weinstein that she "didn't understand at the time" the "magnitude of atrocities and their methods." Sent. Tr. at 340. At the heart of the offense was Ceasar's prolific, often pseudonymous use of social media accounts, including Facebook, as well as encrypted communications services to praise ISIS, spread its propaganda and make connections between other ISIS supporters and recruiters for the group. When arrested in

2016, Ceasar was *en route* to Sweden to marry a man with whom she intended to join ISIS. Ceasar met this man on Facebook. He has since been arrested and charged with a terrorist bombing plot in the Philippines. This illustrates a critical reason why her continued and repeated violations of social media restrictions – first on bail in 2018, and now again on supervised release in 2020 – are so concerning; Ceasar's unmonitored use of social media is dangerous. That is part of the conduct underlying her Material Support Offense and that is what led Judge Weinstein to impose the presentence release conditions he did.

       When Ceasar agreed after her arrest to cooperate ████████████████████████ ████████████████████████████████, Ceasar had the unique opportunity to chart a better, if difficult, life course. Her release on bail in 2018 prior to sentencing was her chance to seize this opportunity and demonstrate that she deserved leniency at sentencing. Ceasar herself recognized this at her bail hearing and promised the Court that she would follow its directives and prove she could be trusted, that "I will show y'all that I will be honest in what I do. April 27, 2017 Hr'g Tr. at 36-37.

       Instead, knowing that the Court was due to sentence her, Ceasar almost immediately violated her bail conditions and, as Judge Weinstein found, "engaged in similar conduct, lied to the government about it, and deleted records of her communications favoring ISIL." Ceasar, 388 F. Supp. 3d at 195. Ceasar deleted so much electronic evidence before the Court revoked her bond in 2018 that the full extent of her conduct on presentence release remains unknown. She did this all while receiving treatment from Dr. Porterfield.

       Then, after the Court revoked her bail and while still pending sentencing on both felony offenses, Ceasar continued violating restrictions, this time the BOP's regulations regarding email and phone communication. When caught and confronted about emailing someone she knew had been barred from the BOP email list, Ceasar demonstrated her wanton deception and lack of accountability by admitting to the conduct but falsely claiming that she had received permission from the government to contact the barred email account when no such permission had been given. Throughout this time, Ceasar also continued minimizing her offense conduct while also referring to non-Muslims as "kuffar" who were oppressing her.

       At sentencing before Judge Weinstein, Ceasar again assured the Court, at length, that she had changed. See Sent. Tr. at 339-43. This culminated in her new promise to follow the rules imposed on her. The Court in turn gave Ceasar an enormous break and another chance to make different, better choices. And yet, even while serving the remaining year of her sentence, Ceasar continued espousing extremist language and breaking BOP rules, leading to her loss of nearly a month of good time credit. Just months before her release, Ceasar plotted to obtain an internet-enabled cellular phone before arriving in New York City and to use it before Probation could install the required monitoring software.

       Since her July 2020 release, Ceasar has again repaid the leniency shown her by immediately betraying the trust placed in her. The flagrant violations and calculated deception this time around are staggering.

To begin, there is no question Ceasar knew her conditions of release, including her obligation to disclose to Probation her use of social media and other electronic communication services. Ceasar's disclosure of her use of certain electronic applications to Probation demonstrates her knowledge of this requirement, even as she failed to disclose others to Probation, sometimes on *the same day*.

For example, Ceasar knew on August 13, 2020, that her creation of a new Facebook account would trigger more scrutiny from Probation precisely because her misuse of Facebook was at the core of both her Material Support Offense and her Obstruction Offense. So Ceasar decided to disclose to Probation her registration of a TikTok account while eliding and then falsely denying her registration of a Facebook account the same day. This was intentional, practiced deception on Probation and the Court. Her undisclosed use and deletion of the encrypted messaging applications Signal and Viber are two more such examples, as is her use the Athan application, which she used to meet Person-1 online.

Ceasar showed the same kind of deceit in recontacting Facebook User 2 upon release, and in her subsequent attempts to cover up their contacts by deleting their texts along with Facebook User 2's contact information from her cellular phone. That Ceasar deleted this information shortly before meeting with her Probation officer is telling; she was trying to cover up the same prohibited communication with Facebook User 2 that she engaged in while on bail in 2018 and which led to her Obstruction Offense.

Ceasar's series of unreported interactions with Person-1, an admitted ISIS supporter whose public profile on the Athan application is the black flag of ISIS, further demonstrates the depths of her betrayal of the Court's trust. Here, Ceasar's purported "search for attention, connection and validation" (March 23, 2021 Def. Letter at 7) led her to: (1) engage with Person-1 over encrypted applications that she hid from Probation; (2) receive money from Person-1; (3) lie to Probation about the source of the money in order to collect it; (4) use Person-2 as a money conduit to deceive Probation and receive more money from Person-1 after an explicit admonition from Probation not to do so, while in real time communicating with mentor Daisy Khan and her Probation officer; and (5) delete evidence of her communications with Person-1 to prevent Probation or the Court from discovering them.

Worse still, after she accepted Person-1's money in September and *before* she tried to obtain more money from him by deceiving Probation, Ceasar had viewed a post in which Person-1 wrote "Christians is our enemy." Instead of cutting off contact after viewing this hateful extremist statement, Ceasar implored Person-1 not to "say that in my phone" and reprogrammed her Signal application to delete her exchanges with him. Ceasar then reinitiated contact with Person-1 and sought money from him through Person-2 as described above. In the middle of this, Ceasar wrote "hahahah," demonstrating her contempt any rule imposed on her.

Ceasar's pervasive contacts with convicted felons without Probation's knowledge or approval is, likewise, a betrayal of the Court's trust and an indication that she cannot be trusted to follow any restriction imposed by the Court. Critically, this conduct has continued since Probation filed its VOSR report dated November 2, 2020 and also since Ceasar appeared before this Court for her VOSR arraignment on November 20, 2020. For example, phone records show additional contacts between Ceasar and ███████████, ███████████ and ███████████ since her November 2020 arraignment and since her guilty plea on January 5, 2021.

Ceasar's attempt to dismiss or minimize her contacts with numerous convicted felons as "correspondence with justice-involved individuals" that "reflects the unhealthy impulses that she is now learning to control" (March 23 Def. Ltr. at 7) ignores that these same unhealthy impulses led Ceasar to provide material support to ISIS and that her inability or refusal to control them poses a danger to the community. The condition exists for good reason. Moreover, even if the content of her communications with these individuals is itself innocuous, Ceasar's refusal to abide by even this simple condition puts in stark relief her disrespect for the Court and Probation and the impossibility of trusting her to follow any other condition.

Any suggestion that Ceasar's conduct since her release occurred because of the COVID-19 pandemic or a lack of resources or support is unfounded and, at this point, untethered from reality. That Ceasar has suffered significant trauma in her life is neither in dispute nor at issue before the Court. The government acknowledges and empathizes with the pain Ceasar has suffered. None of this, however, explains, let alone excuses or mitigates, her perpetual decisions to violate even the most basic conditions that were imposed to help her correct what she herself admits is her "terrible judgment" and the fact that "I can't trust what I think are good decisions." Sent. Tr. 341:4-6.

Ceasar's choices since July 2020 occurred while she was receiving treatment and support from the same people who defense counsel previously argued would be integral to her rehabilitation and better decision-making. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Additionally, between August 13 and October 16, 2020, Ceasar engaged in significant numbers of phone and text communications with Daisy Khan, including more than 400 text communication and approximately 14 phone calls. Critically, Ceasar was in contact with Khan during the same period in September 2020 when Ceasar was secretly communicating with and obtaining money from Person-1 and lying to Probation about it. Indeed, on October 7, Ceasar solicited Person-2's help in tricking her Probation officer and

obtaining more money from Person-1 while simultaneously talking on the phone with Daisy Khan. This was just five days after a call with Dr. Porterfield on October 2. Ceasar has also spoken openly about disobeying her own counsel's instructions aimed at preventing her from further violations of supervised release.



The record is clear. Ceasar alone is responsible for her actions since her release. Her release conditions are plain; she simply chosen to follow them when she wants and ignore them when she does not and, worse, to lie and conceal her conduct. Ceasar is adept at deceiving anyone, including those trying hardest to help her. She has "been 'given a lot of chances'" and instead of changing her behavior she has "consistently 'continued on the same path' only to offer the same empty promises to change." United States v. Legree, No. 19-CR-3794, 2020 WL 7135824, at *2 (2d Cir. Dec. 7, 2020) (citation omitted). Her extensive violations of the Court's trust thus demand a significant sentence. Indeed, given the breadth of Ceasar's violations and her efforts to conceal them, her contempt for the Court's rules, her lies to Probation, the speed with which she committed her violations after release, all notwithstanding the prior – and repeated – leniency shown her, this is precisely the case which imprisonment is "'necessary to deter [her] future criminal conduct, to deter others, and to protect the public.'" United States v. Farnham, 834 F. App'x. 679, 681 (2d Cir. 2021) (citation omitted) (upholding maximum statutory sentence of three years' imprisonment for violation of supervised release). In short, a significant sentence for this conduct is warranted. See, e.g., United States v. Lee, 368 F. App'x. 183, 184 (2d Cir. 2010) (upholding five-year incarceratory sentence for two Grade C violations of supervised release).

Accordingly, the government respectfully requests that the Court impose a sentence of 14 months' incarceration, which is at the high end of the Guidelines range. Although this is higher than Probation's recommended sentence of 12 months' incarceration, the conduct described above is far more extensive than set out in the VOSR Report, and for that reason, the government respectfully submits that the 14 month term is the appropriate sentence for Ceasar's conduct.

IV.    Conclusion

For the foregoing reasons, the government respectfully requests that the Court revoke Ceasar's supervised release and sentence her to 14 months' imprisonment, to be followed by ten years of additional supervised release.

Respectfully submitted,

MARK J. LESKO
Acting United States Attorney

By:    /s/ *Josh Hafetz*                    
Ian C. Richardson
Josh Hafetz
Assistant U.S. Attorneys
(718) 254-7000

cc:    Clerk of Court (KAM) (by ECF)
Deirdre D. von Dornum, Esq. and Samuel Jacobson, Esq. (by Email and ECF)
Michael Imrek, Senior U.S. Probation Officer (by Email)